WILLIAM CHRISTOPHER CARMODY
bcarmody@susmangodfrey.com
ARUN SUBRAMANIAN
asubramanian@susmangodfrey.com
SETH ARD
sard@susmangodfrey.com
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Fl
New York, New York 10019
Telephone:     212-336-8330
Facsimile:     212-336-8340

KATHERINE M. PEASLEE (*pro hac vice* forthcoming)
kpeaslee@susmangodfrey.com
**SUSMAN GODFREY L.L.P.**
1201 Third Avenue, Suite 3800
Seattle, Washington 98101
Telephone:     206-516-3880
Facsimile:     206-516-3883

Attorneys for Plaintiff Mayor and City Council of Baltimore, itself and
on behalf of all others similarly situated

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MAYOR AND CITY COUNCIL OF BALTIMORE,<br><br>                              Plaintiff,<br>v.<br><br>BANK OF AMERICA CORPORATION; BANK OF AMERICA N.A.; BANC OF AMERICA SECURITIES LLC; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; BARCLAYS BANK PLC; BARCLAYS CAPITAL INC.; BMO FINANCIAL GROUP; BMO FINANCIAL CORP.; BMO CAPITAL MARKETS CORP.; BMO CAPITAL MARKETS GKST INC.; CITIGROUP, INC.; CITIBANK N.A.; CITIGROUP GLOBAL MARKETS INC.; CITIGROUP GLOBAL MARKETS LIMITED; THE GOLDMAN SACHS GROUP, INC.; GOLDMAN SACHS & CO. LLC; FIFTH THIRD BANCORP.; FIFTH THIRD BANK; FIFTH THIRD SECURITIES, INC.; JPMORGAN CHASE & CO.; JPMORGAN CHASE BANK, N.A.; J.P. MORGAN SECURITIES LLC; MORGAN STANLEY; | CASE NO:  19-2667<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATIONS OF ANTITRUST LAWS, BREACH OF CONTRACT, AND THE COMMON LAW OF UNJUST ENRICHMENT<br><br><u>JURY TRIAL DEMANDED</u> |

1
2
3
4
5

MORGAN STANLEY SMITH BARNEY LLC;
MORGAN STANLEY & CO. LLC; MORGAN
STANLEY CAPITAL GROUP INC.; THE
ROYAL BANK OF CANADA; RBC CAPITAL
MARKETS, LLC; WELLS FARGO & CO.;
WELLS FARGO BANK, N.A.; WACHOVIA
BANK, N.A.; WELLS FARGO FUNDS
MANAGEMENT, LLC; and WELLS FARGO
SECURITIES LLC,

6                            Defendants.

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1.      Plaintiff MAYOR AND CITY COUNCIL OF BALTIMORE ("Plaintiff"), on its own behalf and on behalf of all those similarly situated, by and through its counsel, brings this Class Action Complaint ("Complaint") against Defendants BANK OF AMERICA CORPORATION; BANK OF AMERICA N.A.; BANC OF AMERICA SECURITIES LLC; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; BARCLAYS BANK PLC; BARCLAYS CAPITAL INC.; BMO FINANCIAL GROUP; BMO FINANCIAL CORP.; BMO CAPITAL MARKETS CORP.; BMO CAPITAL MARKETS GKST INC.; CITIGROUP, INC.; CITIBANK N.A.; CITIGROUP GLOBAL MARKETS INC.; CITIGROUP GLOBAL MARKETS LIMITED; THE GOLDMAN SACHS GROUP, INC.; GOLDMAN SACHS & CO. LLC; FIFTH THIRD BANCORP.; FIFTH THIRD BANK; FIFTH THIRD SECURITIES, INC.; JPMORGAN CHASE & CO.; JPMORGAN CHASE BANK, N.A.; J.P. MORGAN SECURITIES LLC; MORGAN STANLEY; MORGAN STANLEY SMITH BARNEY LLC; MORGAN STANLEY & CO. LLC; MORGAN STANLEY CAPITAL GROUP INC.; THE ROYAL BANK OF CANADA; RBC CAPITAL MARKETS, LLC; WELLS FARGO & CO.; WELLS FARGO BANK, N.A.; WACHOVIA BANK, N.A.; WELLS FARGO FUNDS MANAGEMENT, LLC; and WELLS FARGO SECURITIES LLC (collectively, "Defendants"), for violations of federal antitrust and state law arising from their collusion to manipulate variable rate demand obligation ("VRDO") interest rates from on or before August 1, 2007, through at least June 30, 2016 (the "Class Period").

2.      Plaintiff's claims are based on the investigation and expert analysis conducted by and under the supervision of Plaintiff's counsel. That investigation is ongoing, and Plaintiff may amend its Complaint within thirty days upon receiving any further information from both its inside sources and expert economists. The investigation conducted to date has included reviewing and analyzing information concerning Defendants and VRDO rates that Plaintiff (through its counsel) obtained from, among other sources: (i) publicly available rate information, press releases, news articles, and other media reports (whether disseminated in print or by electronic media); (ii) filings Defendants made with the United States Securities and Exchange Commission

1

("SEC"); (iii) recently disclosed court documents filed in whistleblower actions regarding VRDO rates; and (iv) expert economic analysis performed at the request of counsel for Plaintiff.

3.      Except as alleged in this Complaint, neither Plaintiff nor other members of the public have access to the complete underlying facts relating to Defendants' improper activities. Rather, that information lies exclusively within the possession and control of Defendants and other insiders, which prevents Plaintiff from further detailing Defendants' misconduct. Moreover, pending government investigations—information about which has not yet been made public—concerning potential VRDO collusive rate setting could yield information from Defendants' internal records or personnel that bears significantly on Plaintiff's claims. Plaintiff thus believes further support for its allegations will come to light after a reasonable opportunity for discovery.

## I.      NATURE OF ACTION

4.      This suit concerns Defendants' conspiracy to fix the interest rates of variable rate demand obligations ("VRDOs") issued by Plaintiff Mayor and City Council of Baltimore and a proposed Class of similarly situated individuals and entities in violation of federal antitrust law and in breach of Defendants' contractual commitments.

5.      VRDOs are tax-exempt municipal securities for which the interest rate resets on a periodic basis, most commonly weekly. VRDOS are typically issued by state and local governments, or by housing or healthcare authorities on behalf of projects such as multifamily housing, hospitals, and universities, as a means of raising revenue. VRDOs are primarily held by tax-exempt money market funds ("MMFs"), many of which are owned and managed by Defendants. As a result, Defendants often stand on both sides of VRDOs, without disclosing that fact.

6.      VRDOs provide special benefits to both issuers and investors (bondholders): From an investor's perspective, VRDOs function as short-term securities because they include a "put" feature that allows the investor at each periodic reset date to tender the security back at face value ("par") plus any accrued interest, thereby providing a low-risk, high-liquidity, typically tax-free investment. And for the issuer, VRDOs behave like long-term securities because they allow the

issuer to borrow money for long periods of time—while only paying short-term interest rates. Because of VRDO's tax-exempt status, investors historically have been willing to invest in VRDOs at an interest rate significantly lower than that of commercial paper.

7.     VRDO issuers hire remarketing agents ("RMAs") to perform the periodic rate resets and to exercise best efforts to remarket bonds when investors exercise the "put" option. This requires the RMA to find another investor for a tendered VRDO. If it cannot do so, the obligation to purchase the tendered bond generally falls on a letter-of-credit provider—which is frequently the RMA itself.

8.     RMAs commit, through various documents setting forth their obligations, to set interest rates on VRDOs at the lowest rate possible that will allow the bonds to trade at par, taking into consideration the individual characteristics of the bonds and the environment in the market. In exchange for the RMAs' services, VRDO issuers pay the RMAs substantial remarketing fees.

9.     Defendants are each RMAs that were obligated to set VRDO rates at the lowest possible rate. However, rather than fulfill this obligation, Defendants conspired in a coordinated and confidential scheme to fix rates at elevated levels. This benefited Defendants in several ways: First, it reduced the likelihood that an investor would exercise the "put" feature and thereby trigger Defendants' obligation to carry and remarket the bond; second, where Defendants served as liquidity provider, it reduced the likelihood that its services would be drawn upon; and third, because Defendants owned and managed MMFs holding the VRDOs, Defendants would reap the profits of the increased interest accruing from the higher rates.

10.     While Defendants enjoyed the benefits of their rate-fixing scheme, Plaintiff and similarly situated VRDO issuers suffered to the tune of billions of dollars in overcharges during the Class Period by paying inflated, collusively set interest rates on VRDOs, substantial remarketing fees for remarketing services Defendants did not actually deliver, and liquidity provision fees for services Defendants similarly avoided the need to provide. Furthermore, because VRDOs provide revenue to municipal entities, Defendants' scheme inevitably reduced the funds available for public works, services, and organizations.

3

11.     VRDO issuers naturally have an interest in paying the lowest rates possible. Accordingly, in a competitive market, Defendants would have competed with one another to set the lowest possible interest rates to attract VRDO issuers such as Plaintiff to utilize their remarketing services. That is not what actually happened. Instead, Defendants conspired to restrain competition to their collective benefit, to the detriment of Plaintiff and members of the Class, and in blatant violation of the federal antitrust laws. Plaintiff therefore brings this suit to seek redress on its own and the Class's behalf.

## II.    THE PARTIES

### A.    Plaintiff

12.     Plaintiff Mayor and City Council of Baltimore is an independent city in the State of Maryland. Baltimore issued VRDOs for which Defendants reset rates as remarketing agents during the Class Period. Baltimore consequently was harmed by Defendants' collusive fixing of interest rates on VRDO bonds above a competitive level. Rates were reset on the following VRDOs issued by Baltimore during the Class Period:

| Bond Issued | Remarketing Agent | Total Value |
|---|---|---|
| 1986 IDA | Morgan Stanley | $100 Million |
| 2001 A GO | Morgan Stanley | $43.1 Million |
| 2003 C GO | Citigroup | $23.09 Million |
| 2003 D GO | Citigroup | $17.155 Million |
| 2008 Parking | Citigroup | $77.5 Million |

### B.    Defendants

#### 1.    Bank of America

13.     Defendant Bank of America Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina. Bank of America Corporation is a multi-national banking and financial services corporation with its investment banking division located in New York, New York.

4

14. Defendant Bank of America N.A., is an indirect, wholly owned subsidiary of Bank of America Corporation, and is a federally chartered national banking association with its principal place of business in Charlotte, North Carolina.

15. Banc of America Securities LLC was a Delaware limited liability corporation with its principal place of business in New York, New York. On November 1, 2010, it merged into Merrill Lynch, Pierce, Fenner & Smith Inc. The surviving corporation is Merrill Lynch, Pierce, Fenner & Smith Inc.

16. Defendant Merrill Lynch, Pierce, Fenner & Smith Inc., is a wholly owned subsidiary of Bank of America Corporation, and is a corporation organized under the laws of Delaware with its principal place of business in New York, New York.

17. During the Class Period, Defendants Bank of America Corporation; Bank of America N.A.; Merrill Lynch, Pierce, Fenner & Smith Inc.; Banc of America Securities LLC; and their affiliates and subsidiaries (collectively, "Bank of America") performed rate resetting pursuant to VRDO remarketing agreements with and were letter-of-credit providers for Class members, including through their members, affiliates, and subsidiaries.

## 2. **Barclays**

18. Defendant Barclays Bank PLC is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England, and branch locations in New York, New York.

19. Defendant Barclays Capital Inc. is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business in New York, New York.

20. During the Class Period, Defendants Barclays Bank PLC and Barclays Capital Inc., and their subsidiaries and affiliates (collectively, "Barclays") performed rate resetting pursuant to VRDO remarketing agreements with and were letter-of-credit providers for Class members, including through their members, affiliates, and subsidiaries.

ANTITRUST CLASS ACTION COMPLAINT

### 3. **BMO**

21.     Defendant BMO Financial Group is the brand name for the member companies of the Bank of Montreal, which is incorporated under the laws of Canada with its executive offices in Toronto, Canada.

22.     Defendant BMO Financial Corp. is a wholly owned subsidiary of the Bank of Montreal, and is organized under the laws of Delaware with its principal place of business in Chicago, Illinois.

23.     Defendant BMO Capital Markets Corp. is a wholly owned subsidiary of the Bank of Montreal, and is a corporation organized under the laws of Delaware with its principal place of business in New York, New York.

24.     Defendant BMO Capital Markets Gkst Inc., formerly known as Griffin, Kubik, Stephens & Thompson, Inc., is a corporation organized under the laws of Delaware with its principal place of business in Chicago, Illinois. Griffin, Kubik, Stephens & Thompson, Inc. was acquired by BMO Capital Markets Corp. in May 2008, at which time it changed its name to BMO Capital Markets Gkst Inc.

25.     During the Class Period, Defendants BMO Financial Group, BMO Financial Corp., BMO Capital Markets Corp., BMO Capital Markets Gkst Inc., and their members, affiliates, and subsidiaries (collectively, "BMO"), performed rate resetting pursuant to VRDO remarketing agreements with and were letter-of-credit providers for Class members, including through their members, affiliates, and subsidiaries.

### 4. **Citi**

26.     Defendant Citigroup Inc. ("Citigroup") is a Delaware corporation with its principal place of business in New York, New York.

27.     Defendant Citibank N.A. ("Citibank") is a subsidiary of Citigroup, and is a federally chartered, national banking association with its principal place of business in Sioux Falls, South Dakota.

28.     Defendant Citigroup Global Markets Inc. ("CGMI") is an indirect, wholly owned subsidiary of Citigroup, and is a New York corporation with its principal place of business in New York, New York.

29.     Defendant Citigroup Global Markets Limited ("CGML") is an indirect, wholly owned subsidiary of Defendant Citigroup, and is a U.K.-registered private limited company with its principal place of business in London, England.

30.     During the Class Period, Defendants Citigroup, Citibank, CGMI, and CGML, and their affiliates and subsidiaries (collectively, "Citi"), performed rate resetting pursuant to VRDO remarketing agreements with and were letter of credit providers for Class members, including through their members, affiliates, and subsidiaries.

### 5.     Fifth Third

31.     Defendant Fifth Third Bancorp is a corporation organized under the laws of the State of Ohio with its headquarters in Cincinnati, Ohio.

32.     Defendant Fifth Third Bank is the principal subsidiary of Fifth Third Bancorp and is a corporation organized under the laws of the State of Ohio, with its principal place of business in Cincinnati, Ohio.

33.     Defendant Fifth Third Securities, Inc., a wholly owned subsidiary of Fifth Third Bank, is a corporation organized under the laws of the State of Ohio with its headquarters in Cincinnati, Ohio.

34.     During the Class Period, Defendants Fifth Third Bancorp., Fifth Third Bank, and Fifth Third Securities, Inc., and their affiliates and subsidiaries (collectively, "Fifth Third"), performed rate resetting pursuant to VRDO remarketing agreements with and were letter-of-credit providers for Class members, including through their members, affiliates, and subsidiaries.

### 6.     Goldman Sachs

35.     Defendant The Goldman Sachs Group, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

36.     Defendant Goldman Sachs & Co. LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

37.     During the Class Period, Defendants The Goldman Sachs Group, Inc. and Goldman Sachs & Co. LLC, and their subsidiaries and affiliates (collectively, "Goldman Sachs") performed rate resetting pursuant to VRDO remarketing agreements with and were letter-of-credit providers for Class members, including through their members, affiliates, and subsidiaries.

### 7.     JPMorgan

38.     Defendant JPMorgan Chase & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

39.     Defendant JPMorgan Chase Bank, N.A., a wholly owned subsidiary of JPMorgan Chase & Co., is a federally chartered national banking association with its principal place of business in New York, New York.

40.     Defendant J.P. Morgan Securities LLC, which formerly did business as "J.P. Morgan Securities Inc.," is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

41.     During the Class Period, Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, and their subsidiaries and affiliates (collectively, "JPMorgan") performed rate resetting pursuant to VRDO remarketing agreements with and were letter-of-credit providers for Class members, including through their members, affiliates, and subsidiaries.

### 8.     Morgan Stanley

42.     Defendant Morgan Stanley is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

43.     Defendant Morgan Stanley & Co. LLC, is a wholly owned subsidiary of Morgan Stanley, and is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

ANTITRUST CLASS ACTION COMPLAINT

44.     Defendant Morgan Stanley Smith Barney LLC, doing business as Morgan Stanley Wealth Management, is a wholly owned subsidiary of Defendant Morgan Stanley & Co., Inc., and is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

45.     Defendant Morgan Stanley Capital Group Inc. is a wholly owned subsidiary of Morgan Stanley, and is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

46.     During the Class Period, Defendants Morgan Stanley, Morgan Stanley & Co. LLC, Morgan Stanley Smith Barney LLC, Morgan Stanley Capital Group Inc., and their affiliates and subsidiaries (collectively, "Morgan Stanley"), performed rate resetting pursuant to VRDO remarketing agreements with and were letter-of-credit providers for Class members, including through their members, affiliates, and subsidiaries.

**9.     RBC**

47.     Defendant The Royal Bank of Canada is a company organized and existing under the laws of Canada with its principal place of business in Toronto, Canada. The Royal Bank of Canada has substantial operations in the United States, including in New York, and is a registered broker-dealer with the SEC; a Futures Commission Merchant with the CFTC; registered with FINRA; licensed by the New York Department of Financial Services; and is a registered foreign bank with the Federal Reserve with assets of over $100 billion in the United States.

48.     RBC Capital Markets, LLC, which was formerly known as "RBC Capital Markets Corporation," is a business segment of The Royal Bank of Canada organized and existing under the laws of the State of Minnesota, with its principal place of business and headquarters located in New York, New York.

49.     During the Class Period, Defendants The Royal Bank of Canada and RBC Capital Markets, LLC, and their subsidiaries and affiliates (collectively, "RBC"), performed rate resetting pursuant to VRDO remarketing agreements with and were letter-of-credit providers for Class members, including through their members, affiliates, and subsidiaries.

ANTITRUST CLASS ACTION COMPLAINT

### 10. **Wells Fargo**

50.    Defendant Wells Fargo & Co. is a company organized and existing under the laws of the State of Delaware, with its principal place of business in San Francisco, California.

51.    Defendant Wells Fargo Bank, N.A. operates as a subsidiary of Wells Fargo & Co. and is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in San Francisco, California.

52.    From 2002 through 2008, Defendant Wachovia Bank, N.A. was a federally chartered bank with its principal place of business in Charlotte, North Carolina, and wholly owned by Wachovia Corporation, a publicly traded company listed on the New York Stock Exchange. In March 2010, Wachovia Bank, N.A., merged with Wells Fargo Bank, N.A., and Wells Fargo Bank, N.A., became its successor by merger. "Wachovia" herein refers to Wells Fargo & Co. and its successor by merger, Wells Fargo Bank N.A.

53.    Defendant Wells Fargo Funds Management, LLC, is a wholly owned subsidiary of Wells Fargo & Company, organized and existing under the laws of the State of Delaware, with its principal place of business in San Francisco, California.

54.    Defendant Wells Fargo Securities LLC is an indirect, wholly owned subsidiary of Defendant Wells Fargo & Co., and is a limited liability company organized and existing under the laws of Delaware, with its principal place of business in Charlotte, North Carolina.

55.    During the Class Period, Defendants Wells Fargo & Co., Wells Fargo Bank, N.A., Wachovia Bank, N.A., Wells Fargo Funds Management, LLC, and Wells Fargo Securities LLC, and their affiliates and subsidiaries (collectively, "Wells Fargo") performed rate resetting pursuant to VRDO remarketing agreements with and were letter-of-credit providers for Class members, including through their members, affiliates, and subsidiaries.

### III.    **JURISDICTION AND VENUE**

56.    This Court has jurisdiction over the subject of this action pursuant to 15 U.S.C. §§ 15 and 26, as well as 28 U.S.C. §§ 1331 (federal question) and 1337 (commerce and antitrust regulation).  This Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367, as the matters at the heart of those claims form part of the same case or controversy.

10

57.     Defendants' activities, and those of their co-conspirators, were within the flow of, were intended to, and had a substantial effect on interstate commerce.

58.     This Court has personal jurisdiction over Defendants through their nationwide contacts, pursuant to 15 U.S.C. § 22. Defendants are subject to personal jurisdiction on the basis that (a) most of the co-conspirator Defendants have their principal place of business in or were formed in the United States; (b) the conspiracy was directed at, carried out in substantial part in, and had the intended effect of, causing injury to Plaintiff and class members residing in, located in, or doing business throughout the United States; and (c) each Defendant, either directly or through its respective agents or affiliates, transacted business throughout the United States, including in this District, that was directly related to Plaintiff's claims, including by engaging in the coordinated remarketing activities alleged herein.

59.     Venue is proper in this Court pursuant to 15 U.S.C. §§ 15(a) and 22; and 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District, and each of Defendants transacts business and maintains facilities in this District and thus is subject to personal jurisdiction here.

## IV.   FACTUAL ALLEGATIONS

### A.   The VRDO Ecosystem

60.     VRDOs (also known as Variable Rate Demand Notes, or VRDNs) are municipal bonds that allow the issuer to receive financing at short-term rates when borrowing long-term. They play a vital role for municipal bond issuers seeking to diversify their debt structure and to raise funding for various long-term projects, infrastructure, and public works. Public entities also issue VRDOs on behalf of various 501(c)(3) charitable organizations. As of November 30, 2013, there were approximately 9,000 VRDOs outstanding in the United States with a collective balance of roughly $223 billion.

61.     VRDOs are floating-rate obligations that typically have a nominal long-term maturity of 20 to 30 years, but have an interest rate that is reset periodically, usually on a weekly basis.

62.     In addition to the periodically resetting interest rate, a defining element of VRDOs is a demand feature that allows investors to "put" or "tender" the VRDOs back to the issuer on the interest reset date. The "put" feature of VRDOs gives the investor the right to require the issuer to repurchase the bonds from the investor at the full face value of the VRDO ("par") plus accrued interest, and requires a form of liquidity in the event of a failed remarketing.

63.     Issuers of VRDOs typically hire remarketing agents to determine the interest rates for their VRDOs at each reset date and to actively endeavor to resell VRDOs tendered by an investor exercising its "put" option. These RMAs are required to set interest rates at the lowest rate possible that will allow the VRDO to trade at par.

64.     If an issuer believes a rate set by an RMA is higher than the rate it could obtain from another RMA, the issuer is free to replace the RMA with one of that RMA's competitors. Accordingly, RMAs should be incentivized to compete with one another to offer the best rates for municipal issuers.

65.     In exchange for an RMA's resetting and reselling services, VRDO issuers such as Plaintiff pay RMAs high annual fees—on average, approximately 10 basis points of the VRDO debt balance (with one basis point equaling one hundredth of one percent). This means that for a $150 million bond, the annual remarketing fee paid by the issuer to the RMA would be $150,000. Plaintiff and Class members collectively paid hundreds of millions of dollars' worth of remarketing fees to Defendants during the Class Period.

66.     Investors accept lower interest rates on VRDOs because of the special benefits provided by VRDOs: The "put" feature means that VRDOs provide increased liquidity; the guarantee of trading at par mitigates market price risk; and VRDOs' tax-exempt status differentiates them from the most analogous short-term security, 7-day AA financial commercial paper.

67.     VRDOs are typically secured by letters of credit ("LOCs") or a standby bond purchase agreement ("SBPAs") from major banks or financial institutions, including Defendants. These institutions providing LOCs or SBPAs are known as liquidity providers, and, as the name suggests, must provide liquidity for VRDOs tendered by investors who opt to "put" the bonds

ANTITRUST CLASS ACTION COMPLAINT

back to the issuer. Often the same institution acting as the RMA—again, including Defendants—will also serve as the liquidity provider. Issuers typically pay liquidity providers an annual fee between 50 and 150 basis points of the VRDO debt balance for this liquidity and credit enhancement; in other words, for a $150 million bond, an issuer such as Plaintiff would pay an LOC provider an annual fee in an amount between $750,000 and $2.25 million.

68.     VRDOs are issued in minimum $100,000 denominations. Accordingly, smaller investors can only invest in VRDOs indirectly, such as through money market funds ("MMFs"). VRDOs' liquidity puts them within the category of money-market-eligible securities; and indeed, tax-exempt MMFs are the largest holder of VRDOs. Many of these MMFs are owned and managed by Defendants.

**B.     Defendants Were Obligated to Set VRDO Rates at the Lowest Possible Level**

69.     Defendants' obligations as RMAs are set forth in several different documents: (1) Remarketing Agreements, (2) Indentures, and (3) Official Statements.

70.     When Plaintiff and Class members hired Defendants to serve as RMAs for their VRDOs, they executed Remarketing Agreements with Defendants. These Remarketing Agreements established the contractual duties and obligations of Defendants as RMAs, including, *inter alia*, Defendants' respective duties to (1) set interest rates at each reset date at the lowest rate possible that would permit the bond to trade at par, taking into consideration characteristics of both the bond and the market; and (2) accept back and actively remarket any VRDO tendered by and investor exercising the "put" option.

71.     In some cases a Remarketing Agreement does not itself specify the obligations of the RMA but instead incorporates by reference an Indenture—the contract under which the VRDO is actually issued—that sets forth those terms.

72.     For example, a 2008 Remarketing Agreement entered into between Plaintiff and Defendant Citi requires that Citi, as Remarketing Agent, "determine the rate of interest for the Bonds during each Interest Rate Period. . . as provided in Section 2.04 of the First Supplemental Indenture." The First Supplemental Indenture in turn requires that the Remarketing Agent determine the weekly reset rate as that which, "in the judgment of the Remarketing Agent," is

"the minimum interest rate which, if borne by the Series 2008 Bonds, would enable the Remarketing Agent to sell all of the Series 2008 Bonds on the effective date of that rate at a price (without regard to accrued interest) equal to the principal amount thereof."

73.    The same 2008 Remarketing Agreement between Plaintiff and Citi further requires that Citi "offer for sale and *use its best efforts to sell* any Bonds which are required to be remarketed." (emphasis added).

74.    Official Statements provide another source of Defendants' obligations as RMAs: These are the offering and disclosure documents provided to investors to market the VRDOs. Official Statements are not themselves contracts, but they inform investors of the terms of the offering and the process that will be used by RMAs to periodically reset interest rates and remarket tendered bonds pursuant to their contractual commitments embodied in the Remarketing Agreement and/or Indenture.

75.    For example, a 2008 Official Statement relating to VRDOs issued by Plaintiff for which it contracted with Defendant Citi as RMA stated that Citi would set interest at a "Weekly Rate," specifying that,

> [t]he Weekly Rate shall be *the lowest interest rate*, not exceeding the Maximum Rate, which, *in the determination of the Remarketing Agent as of the date of determination and under prevailing market conditions*, would result as nearly as practicable in the market price for the Remarketed Bonds on the Weekly Effective Rate Date being one hundred percent (100%) of the principal amount thereof.

(emphases added). This same official statement represents that the RMA will "*use its best efforts to remarket* Series 2008 Bonds subject to optional and mandatory tender for purchase."

76.    Another official statement, dated June 2001, pertaining to VRDOs issued by Plaintiff and for which it contracted with Morgan Stanley to serve as RMA, likewise requires Morgan Stanley to set weekly rates,

> as *the minimum rate of interest necessary*, in the judgment of the Remarketing Agent, *taking into account the then prevailing market conditions*, to enable the Remarketing Agent to sell such Series 2001 Bonds on such first day at a price equal to the principal amount thereof plus accrued interest, if any, thereon.

14

(emphases added). This same official statement represents that "The Remarketing Agent shall, subject to the terms of the Remarketing Agreement, ***use its best efforts to offer for sale and sell***" any bonds tendered by investors. (emphasis added).

77.     An RMA's duty to reset rates as low as possible and to use best efforts to actively resell tendered VRDOs is consistently reflected in Official Statements related to VRDOs issued by members throughout the Class. For example, a 2014 official statement pertaining to the 2014 Series A Bonds issued by the New York State Housing Finance Agency states that Defendant JPMorgan, as Remarketing Agent, "shall determine" the weekly rate by determining "***the lowest interest rate***, not exceeding the Maximum Rate, which would, in the judgment of the Remarketing Agent," enable the bond holder to sell the bond "at a price that is equal to the principal amount thereof plus accrued interest thereon" and that takes into consideration the market conditions for such bonds. (emphasis added). This same official statement explains that "The Remarketing Agreement requires that the Remarketing Agent ***use its best efforts*** to sell tendered 2014 Series A Bonds at par, plus accrued interest." (emphasis added).

78.     Industry standards underscore the commitments set forth in Defendants' Remarketing Agreements, Indentures, and Official Statements: Municipal Securities Rulemaking Board ("MSRB") Rule G-17 requires RMAs to deal "fairly" with the issuers and "not engage in any deceptive, dishonest, or unfair practice." And MSRB Rule G-18 specifically requires RMAs to "make a reasonable effort to obtain a price for the customer that is fair and reasonable in relation to prevailing market conditions." As the MSRB explains it, this means that RMAs "will exercise the same level of care as the professional would if acting for its own account, including the exercise of diligence in ascertaining prevailing market conditions."

## C.     Defendants Secretly Conspired to Fix VRDO Interest Rates at Supracompetitive Levels

79.     Defendants had an obligation to exercise their expertise, assess bond-specific characteristics and market conditions, and set interest rates at the lowest possible level that would allow the VRDOs to trade at par. Defendants did not do so. Instead, Defendants conspired with one another to set uniformly high interest rates, suppressing competition in the market and reaping the profits from the resulting VRDO-related overcharges paid by Plaintiff and the Class.

80.     Defendants' coordinated rate-setting provided them with multiple benefits: First, when an investor exercises the "put" option on a VRDO, the RMA has to carry that VRDO in its inventory until it can be resold and must exercise its own efforts to find a new investor to purchase the bond. By maintaining artificially high interest rates, Defendants reduced the likelihood that bondholders would tender bonds back to them as RMAs, thus eliminating the need for Defendants to carry the bond or expend the time and resources necessary for its resale.

81.     Second, if an RMA is unable to find a new investor when a VRDO is tendered back to an RMA through exercise of the "put" feature, the liquidity provider is required to supply liquidity for the bond pursuant to a LOCs or, less often, an SBPA. Frequently Defendants serve as the liquidity provider for the same VRDOs for which they or their co-conspirators provide remarketing services: For instance, Bank of America provided liquidity for at least three of the VRDOs issued by Plaintiff. Accordingly, maintaining artificially high interest rates such that investors would hold onto their VRDOs rather than exercising the "put" avoided the need to draw on the liquidity services provided by Defendants. This both reduced risk to Defendants and again resulted in Plaintiff and other Class members paying high fees for LOC and SBPA services that Defendants avoided providing through their collusion.

82.     Third, VRDOs are held primarily by tax-exempt MMFs, many of which are owned and managed by Defendants. Accordingly, Defendants further benefited from their collusively inflated interest rates on VRDOs held by their own MMFs.

83.     Defendants' conspiracy was facilitated by the fact that a relatively small number of firms provide remarketing services for the majority of VRDO bonds. From 2009 through 2013, Defendants Bank of America, Barclays, Citi, Morgan Stanley, and Wells Fargo were among the top 10 remarketing agents in the market; and a SIFMA report shows that as of December 2011, Defendants collectively served as remarketing agents for a majority of the outstanding VRDO bonds.

84.     Provision of liquidity (largely through letter of credit services) is and has been similarly concentrated among a handful of firms, with Defendants providing such services for much of the VRDO market. For instance, as of August 2012, just three of Defendants—Bank of

America, JPMorgan, and Wells Fargo—alone accounted for approximately 40% of the VRDO-credit-support market in each of 2011, 2012, and 2013. As of December 2013, RBC, Barclays, and Citi similarly each ranked in the top ten credit-support providers.

85.     This market concentration aided Defendants in concealing their collusion: Defendants' conspiracy was, by its very nature, confidential and undiscoverable by Plaintiff and other Class members because it consisted of coordinated efforts between a small number of players through private communications and inside channels.

86.     Furthermore, Defendants have actively sought to avoid detection of their scheme by at all times outwardly representing that they have and continue to abide by their obligations to reset rates at the lowest possible level.

87.     For example, Defendant Morgan Stanley has published a primer on VRDOs explaining that VRDO rates are reset by a remarketing agent "in correlation with market supply and demand," when in fact Morgan Stanley has conspired with its co-defendants to set rates at a level that have nothing to do with "market demand."

88.     A similar primer provided by Wells Fargo explains that the periodic-reset feature of VRDOs "ensures that [VRDO] yields reflect the current interest-rate environment." Once again, Wells Fargo's representation hides the reality that rates have consistently been set through collusive rate-fixing rather than market-based considerations.

89.     Plaintiff has always sought to obtain the best rates possible for its VRDOs. Similarly, Class members, which are primarily city and state municipal entities seeking to raise revenue for public works and services, have every incentive to exercise due diligence in an effort to obtain the lowest possible rates.[1] However, because of Defendants' active concealment of their rate-fixing scheme—and the limited municipal resources available to Plaintiff and other similarly situated entities that issue VRDOs—Plaintiff and other members of the Class could not have reasonably discovered Defendants' scheme.

---

[1] For example, a presentation compiled by the Metropolitan Transportation Authority states that pursuant to its Variable Rate Debt Policy, the Authority's goal is "to achieve the lowest possible interest cost on its debt."

90.     Because Defendants actively concealed their rate-fixing conspiracy from Plaintiff and members of the Class, any and all statutes of limitations applicable to the claims of Plaintiff and Class members are equitably tolled.

**D.     A Whistleblower Sheds Light on Defendants' Coordinated and Secretive Scheme**

91.     A whistleblower has filed qui tam suits in at least four different states alleging collusion between banks, including many of Defendants, to artificially and collusively set VRDO interest rates.

92.     One of these suits, filed on behalf of the State of Illinois, has been unsealed and made public. The whistleblower's Illinois complaint alleges that the banks used a coordinated "Robo-Resetting" scheme to mechanically set VRDO interest rates en masse, without any consideration of the individual characteristics of the bonds, market conditions, or investor demand. It further alleges that through this scheme, the banks have collectively imposed artificially high interest rates on VRDOs—thereby discouraging investors from tendering bonds back to the RMA and avoiding the need for the conspiring banks to actually provide the remarketing services for which they have been hired or the liquidity for which they are in many cases responsible.

93.     The whistleblower performed a detailed pricing analysis revealing that from at least April 2009 through November 2013, VRDO interest rates grouped together in "buckets" in a manner that would be statistically impossible had the banks actually priced VRDO interest rates individually and taking into account relevant factors and market conditions, as they are required to do.

94.     The whistleblower further performed a VRDO-interest-rate simulation based on real-world changes in the SIFMA weekly VRDO pricing index and real-world distribution of the weekly rate changes across the entire VRDO market, accounting for any actual changes in the market or economy that might have impacted VRDO rates during the relevant period. This simulation showed no rate "buckets" for *any* meaningful length of time. By contrast, the *actual* interest rates set by the banks clustered into "buckets" in the vast majority of cases.

18

95.     Specific empirical analyses set forth in the qui tam complaint further include the following:

a.      The whistleblower isolated a "bucket" of 231 VRDOs from Defendants Citi, Morgan Stanley, Bank of America, and Wells Fargo with closely matching interest rates and showed that for one given year during the Class Period (October 2012 through October 2013), these rates moved in *near-perfect* lock step, as illustrated in the chart below:



b.      The whistleblower also randomly selected ten VRDOs from each of Defendants JPMorgan, Citi, Morgan Stanley, Bank of America, and Wells Fargo, and found that for these 50 randomly selected bonds, interest rates set by Defendants in 2012 moved almost identically, as illustrated in the chart below:

ANTITRUST CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9



10      96.     The statistical analysis performed by the whistleblower supports its allegations of

11   collusion. However, as the Illinois state court explained in denying the defendant banks' motion

12   to dismiss the whistleblower complaint, the collusion between banks could not have been

13   discovered by the public from the publicly available interest rates used for that analysis, because

14   those "are just raw data" and do not reveal the scheme through which the rates were reset.

15      97.     An industry publication reported that the SEC began inquiring into a number of

16   banks' VRDO rate-resetting practices in September 2018. The report states that the SEC sent

17   approximately 20 letters of inquiry to the 12 top banks and broker-dealers that serve as

18   remarketing agents for VRDOs, seeking information and documents about their respective rate

19   setting and remarketing practices.

20      98.     According to sources cited by the same industry publication, the antitrust division

21   of the Department of Justice ("DOJ") has begun conducting a criminal investigation of VRDO

22   remarketing practices.

23      **E.     Expert Economic Analysis Supports Defendants' Collusion**

24      99.     Plaintiff's economic analysis of current and historical rate data for VRDOs

25   supports the existence of a conspiracy between Defendants to elevate VRDO interest rates from

26   August 2007 through June 2016.[2] Plaintiff's economic experts performed three different tests to

27   

28   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [2] Plaintiff's economic analysis is based on currently available data and therefore may not reveal
     the full scope and effects of Defendants' hidden, collusive conduct.

analyze VRDO rates and collusion between Defendants during the Class Period: they (1) compared VRDO rates to a neutral benchmark rate both before and during the Class Period, (2) evaluated the degree to which VRDO rates were dispersed during the Class Period, and (3) assessed coordination between Defendants by comparing the size of "rate clusters" before and during the Class Period. Each of these analyses supports Plaintiff's allegation that Defendants conspired to fix VRDO interest rates at an artificially high level during the Class Period.

*Comparison to a Benchmark Rate*

100.    The SIFMA Municipal Swap Index ("SIFMA") is an average of all VRDO rates that resets on each Wednesday at 4pm. If Defendants did not collude to inflate the VRDO rates during the Class Period, then the SIFMA index (which is comprised of VRDO rates) should not be inflated compared to a benchmark. Plaintiffs' experts compared SIFMA to 7-day AA financial commercial paper rates. VRDOs, SIFMA's constituents, are tax-exempt. Therefore one would expect SIFMA to have a much lower yield than 7-day AA financial commercial paper rates.

101.    As can be seen in **Figure 1**, before the Class Period, the comparison of SIFMA and 7-day AA financial commercial paper rates provides the results one would expect. Namely, the yield on taxable commercial paper is noticeably higher than the yield on tax-exempt VRDOs. However, during the Class Period, the margin between the yields on taxable commercial paper and on tax-exempt VRDOs plummets—indeed, the rates are nearly identical. This supports the existence of Defendants' conspiracy to artificially elevate interest rates on VRDOs.

**Figure 1: Comparison of 7-Day AA Financial Commercial Paper Rate and SIFMA Municipal swap yield by period**



*Degree of Rate Dispersion*

102.    In addition to comparing VRDO rates to a neutral benchmark rate both before and during the Class Period, experts for Plaintiffs analyzed the dispersion of VRDO rates during the Class Period. More dispersed rates would suggest that Defendants were exercising their independent judgment to set rates on a case-by-case, bond-by-bond basis, as they were required to do under their obligations as RMAs. Less dispersed rates, by contrast, support the existence of conspiracy and coordination amongst Defendants to fix rates. Accordingly, if Defendants did not collude to set VRDO interest rates during the Class Period, the dispersion of VRDO rates during the Class Period should not be lower than before the Class Period.

103.    To test whether VRDO rates during the Class Period were in fact less dispersed, Plaintiff's experts calculated the 25th and 75th percentiles of all reset rates. To measure the dispersion of rates, they calculated the distance between the 75th percentile and the 25th percentile.

104.    **Figure 2** shows the result of this analysis for VRDOs that reset on Tuesday, while **Figure 3** shows the results of the analysis for VRDOs that reset on Wednesday. Both figures

ANTITRUST CLASS ACTION COMPLAINT

show that the dispersion is higher before the Class Period compared to the dispersion during the Class Period. Again, this supports the existence of Defendants' collusion to manipulate VRDO interest rates.

**Figure 2: Distance between 75th and 25th percentile of Tuesday reset rates by period**



**Figure 3: Distance between 75th and 25th percentile of Wednesday reset rates by period**



*Analysis of "Rate Clusters"*

105.   Finally, to further analyze coordination between Defendants, Plaintiff's experts performed an assessment of "rate clusters." To do so, they identified situations in which

ANTITRUST CLASS ACTION COMPLAINT

Defendants reset rates for different VRDOs on the same day at the exact same rate, which they

defined as a "rate cluster." If the Defendants coordinated the setting of reset rates, one would

expect greater numbers of VRDOs in rate clusters during the Class Period.

106.    **Figure 4** shows the average size of the largest daily rate clusters, as measured by

the number of CUSIPs in those clusters, before and during the Class Period.[3] This chart shows

that VRDOs were more likely to be a part of a cluster during the Class Period than before that

period, which supports the existence of coordination of the reset rates by Defendants.

**Figure 4: Average number of CUSIPs in the largest rate cluster**



107.    In short, all the economic analysis performed by Plaintiff's experts supports a

conspiracy between Defendants to collusively set VRDO rates at an artificially high level during

the Class Period.

108.    Further expert analysis confirms that these patterns all cease around the time of the

end of the Class Period—just as the SEC was reportedly beginning its investigation into

Defendants' collusion.

---

[3] "CUSIP," the acronym for Committee on Uniform Security Identification Procedures, refers to the nine-digit, alphanumeric identifiers that are used to identify securities, including municipal bonds. Each maturity of a municipal security issue receives a unique CUSIP.

F.      **Defendants Violated their Contractual Duties through their Anticompetitive Rate-Fixing**

109.    Defendants' collusive scheme to fix VRDO interest rates at an artificially elevated level violated industry rules and their own contractual commitments to Class members, as set forth in remarketing agreements, indentures, and official statements.

110.    Defendants each agreed, through contracts entered into with Class members, to set VRDO interest rates at the lowest rate possible that would allow the bond to trade at par. Defendants contracted to make these determinations on a bond-specific, case-by-case basis, and collected high annual fees in consideration for their provision of this rate-setting service. Defendants' failure to set rates as low as possible, based on a given bond's characteristics and market conditions at a given moment, constitutes a breach of their contractual commitments to Plaintiff and members of the Class.

111.    Defendants further contracted to actively remarket VRDOs tendered by investors exercising the "put" option, and to use best efforts and act in good faith when performing this duty. Once again, Defendants did not do so. Rather, they conspired with one another to keep rates elevated such that investors would hold onto VRDOs, avoiding the need for Defendants to (1) accept the bond back and carry it in their inventory, and (2) expend the time and resources necessary to remarket the bond—despite continuing to collect high annual fees from Plaintiff and Class members for precisely these services.

112.    Defendants' collusive setting of artificially high rates violated their contractual obligations to exercise good faith in performing their rate-resetting duties and to set interest rates at the lowest possible level that would allow the affected bonds to trade at par.

113.    Defendants' conspiracy to set elevated interest rates on VRDOs further breached their contractual obligations and their duty of good faith and fair dealing to provide remarketing and, in many cases, liquidity services to Plaintiff and Class members. Throughout the Class Period, Defendants contracted to perform these services; collected hundreds of millions in fees for the performance of these services; and rigged the market so that they would not have to perform.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**G.**     **Plaintiff and the Class Members have Suffered Injury from Defendants' Conduct**

114.     Because of Defendants' anticompetitive interest rate fixing scheme, Plaintiff and the Class paid billions of dollars in VRDO-related overcharges during the Class Period. These overcharges came in the form of inflated interest rates on VRDOs for which Defendants fixed rates at elevated levels; high remarketing service fees for remarketing services that Defendants never actually performed; and even higher LOC and SBPA fees for liquidity services that Defendants rarely, if ever, performed.

115.     **Inflated Interest Rates.** Plaintiff and Class members suffered direct injury in the form of overcharges on interest rates for their VRDOs (whether they paid as issuer or as obligor of those bonds). Plaintiff and Class members are actively incentivized to seek the lowest possible rates on their debt, and in a competitive market, Defendants would have vied with one another to offer the lowest possible rates. They did not do so. Historically, the interest rates on VRDOs have been approximately 75 percent of the rates on commercial paper. Since August 2007, however, Defendants' average VRDO pricing has been well above that level, translating to hundreds of millions of dollars in interest rate overcharges paid by Plaintiff and the Class.

116.     **Remarketing Fees.** Plaintiff and the Class paid, on average, remarketing fees equal to 10 basis points per year on the outstanding debt balance of the VRDOs for which Defendants served as RMAs. These fees were to compensate Defendants for (1) resetting rates based on bond and market-specific considerations at the lowest possible rate, and (2) actively remarketing bonds tendered back by investors. Defendants entirely failed to perform the former obligation; and, because of collusively elevated rates that encouraged investors to sit on VRDOs rather than exercising their "put" option, avoided the need for Defendants to perform the latter.

117.     As of June 2011, the total outstanding debt value for VRDOs was approximately $373.1 billion. In 2011, Defendants collectively provided remarketing services for a majority of the VRDO market. Accordingly, in 2011 *alone*, Plaintiff and Class members paid Defendants hundreds of millions of dollars to Defendants in remarketing fees for remarketing services Defendants did not provide.

ANTITRUST CLASS ACTION COMPLAINT

118. **Liquidity Provision Fees**. Plaintiff and the Class paid, on average, liquidity provision fees equal to between 15 and 50 basis points per year on the outstanding debt balance of the VRDOs for which Defendants provided liquidity through LOC or SBPA services. However, because Defendants conspired to maintain artificially high interest rates, they discouraged investors from tendering VRDOs back and thus avoided the need to step in and provide liquidity if a tendered bond could not be resold.

119. Accordingly, Defendants provided liquidity through LOC or SBPA services for which they collectively charged hundreds of millions of dollars in single years alone. Thus again, Plaintiff and Class members paid hundreds of millions of dollars or more to Defendants in LOC and SBPA fees for liquidity provision services that were rarely, if ever, drawn upon.

## V.   **CLASS ACTION ALLEGATIONS**

120. Plaintiff brings this case on behalf of itself and as a class action under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of all members of the following Class (the "Class"):

> All persons or entities that paid interest charges on variable rate demand notes for which Defendants reset the interest rate during the period from August 1, 2007, through June 30, 2016, (the "Class Period") pursuant to remarketing agreements entered into with Class members. This class excludes (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) the government of the United States, and (c) any judges or justices involved in this action and any members of their immediate families or their staff.

121. Plaintiff does not currently know the exact number of the members of the Class but believes that they number in the thousands.

122. Common questions of law and fact exist as to all members of the Class and predominate over any individualized issues or questions. Such common questions of law and fact include but are not limited to:

    a.    Whether Defendants conspired to set artificially high interest rates on VRDOs during the Class Period;

    b.    Whether Defendants failed to set VRDO interest rates at the lowest possible level in violation of their contractual commitments to do so during the Class Period;

c. Whether Defendants created conditions that discouraged investors from tendering bonds back to RMAs during the Class Period;

d. Whether Defendants' conduct constitutes a conspiracy in restraint of trade or commerce in violation of Section 1 of the Sherman Act;

e. Whether Defendants unjustly enriched themselves to the detriment of the Plaintiff and members of the Class, thereby entitling Plaintiff and members of the Class to disgorgement of all benefits derived by Defendants;

f. Whether Defendants' conduct caused injury to the business or property of Plaintiff and members of the Class;

g. The effect of Defendants' unlawful conduct on the market for variable rate demand obligation interest rates in the United States and its territories during the Class Period;

h. The appropriate injunctive and related equitable relief for the Class; and

i. The appropriate class-wide measure of damages for the Class.

123. Plaintiff's claims are typical of the claims of the members of the Class, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' wrongful conduct in that they paid supracompetitive interest rates on VRDOs for which Defendants set rates as part of the remarketing services they provided to Class members; and further paid substantial remarket fees for remarketing services that Defendants did not provide in accordance with their agreements to do so.

124. Plaintiff's claims and those of the members of the Class arise from the same common course of conduct. Plaintiff's interest coincides with, and is not antagonistic to, the interests of other members of the Class. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

125. The questions of law and fact common to members of the Class predominate over any questions affecting only individual members, including any individual legal and factual issues relating to liability and damages.

126.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy because (a) it will avoid a multiplicity of suits and consequent burden on the courts and Defendants; (b) it would be virtually impossible for all members of the Class to intervene as parties-plaintiffs in this action; and (c) it will provide court oversight of the claims process, once Defendants' liability is adjudicated.

127.    This case is also appropriate for certification as a class action because Defendants and their co-conspirators have acted and refused to act on grounds generally applicable to the Class, so that final injunctive relief will be appropriate with respect to the Class as a whole.

## FIRST CLAIM FOR RELIEF

### (For Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)

128.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

129.    Defendants, by and through their officers, directors, employees, agents or other representatives, along with the co-conspirators referenced herein, have entered into unlawful agreement(s), combination(s) and conspiracies in restraint of trade, in violation of 15 U.S.C. § 1. Such conduct is actionable under the private attorney general provisions for civil litigants under the Clayton Act.

130.    These conspiratorial acts, combinations, and agreements have caused unreasonable restraints in the market for VRDO interest rates, without countervailing and offsetting pro-competitive benefits.

131.    Plaintiff and the other Class Members have been harmed by injury to competition in these markets and by being forced to pay inflated interest rates on VRDOs. Plaintiff and other Class Members have further been harmed by being forced to pay remarketing fees for remarketing services that were not provided, and, in many instances, by paying for LOC or SBPA services that were never drawn upon as a consequence of Defendants' anticompetitive conduct.

132.    Plaintiff seeks the relief set forth below and in this cause of action seeks such relief on behalf of itself and all Class Members against Defendants.

ANTITRUST CLASS ACTION COMPLAINT

## SECOND CLAIM FOR RELIEF

### (For Breach of Contract)

133.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

134.    During the Class Period, Plaintiff and members of the Class were parties to remarketing agreements with Defendants pursuant to which Defendants agreed to (1) reset interest rates on Plaintiff's and the Class's VRDOs at the lowest possible rate, and (2) actively remarket VRDOs tendered back by investors.

135.    Defendants breached their obligations under their respective remarketing agreements with Plaintiff and the members of the Class by conspiring to set artificially high VRDO interest rates and avoiding the need to provide any remarketing services.

136.    Plaintiff and the members of the Class are entitled to damages sufficient to place Plaintiff and the members of the Class in the same situation as if Defendants had fully performed under their contracts. Defendants' breaches of contract caused injury to Plaintiff and the members of the Class in the form of economic damages in an amount to be determined at trial.

137.    Plaintiff further seeks the relief set forth below on behalf of itself and all Class Members against Defendants.

## THIRD CLAIM FOR RELIEF

### (Unjust Enrichment and Disgorgement of Profits)

138.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

139.    Defendants have been unjustly enriched through overpayments by Plaintiff and Class Members and the resulting profits. As set forth in Plaintiff's allegations above, Defendants knowingly acted unfairly and in an unconscionable and oppressive manner toward Plaintiff and the Class and consciously and/or recklessly disregarding their rights when Defendants conspired to set artificially high interest rates on VRDOs.

140.    Plaintiffs and Class members paid for remarketing services that Defendants never performed, thereby unjustly enriching Defendants. Defendants were further unjustly enriched by

the fees paid by Plaintiff and members of the Class for liquidity services Defendants committed to providing pursuant to LOCs and SBPAs entered into with Plaintiff and members of the Class. By colluding to maintain artificially high VRDO interest rates, Defendants created conditions in which investors were unlikely to tender VRDOs for remarketing, thereby eliminating the risk that the LOCs or SBPAs would need to be drawn upon. Defendants thus collected hundreds of millions of dollars or more during the Class Period for liquidity services they never provided.

141.    Under common-law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred via overpayment by Plaintiff and Class Members for artificially high VRDO interest rates, remarketing services never provided, or liquidity provision services that Defendants avoided providing.

142.    Plaintiff seeks disgorgement of all profits resulting from such overpayment and establishment of a constructive trust from which Plaintiff and Class Members may seek restitution.

## VI.    JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Mayor and City Council of Baltimore, on behalf of itself and a Class of all others similarly situated, requests that the Court enter an order or judgment against Defendants including the following:

a.    That this action may be maintained as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), that Plaintiff shall represent the Class, and that Plaintiff's counsel shall be appointed as Class Counsel;

b.    That Defendants' conduct be adjudged and decreed to violate the law as alleged in the Complaint;

c.    That Plaintiff and the Class Members recover damages, including treble damages as provided by Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, and interest;

d. That Defendants be enjoined and restrained from in any manner continuing, maintaining, or renewing their anticompetitive conduct or adopting or following any practice, plan, program, or device with a similar purpose or effect;

e. Damages against Defendants for their breaches of contract;

f. Disgorgement and/or restitution to Plaintiff and the Class for Defendants' unjust enrichment;

g. Reasonable attorneys' fees and costs;

h. That Plaintiff and the Class Members be awarded pre- and post-judgment interest; and

i. All other relief to which Plaintiff Mayor and City Council of Baltimore and the Class may be entitled at law or in equity including injunctive relief.

Dated:  March 25, 2019

By:  */s/ William Christopher Carmody*
WILLIAM CHRISTOPHER CARMODY
bcarmody@susmangodfrey.com
ARUN SUBRAMANIAN
asubramanian@susmangodfrey.com
SETH ARD
sard@susmangodfrey.com
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Fl
New York, New York 10019
Telephone:     212-336-8330
Facsimile:     212-336-8340

KATHERINE M. PEASLEE (*pro hac vice*
forthcoming)
kpeaslee@susmangodfrey.com
**SUSMAN GODFREY L.L.P.**
1201 Third Avenue, Suite 3800
Seattle, Washington 98101
Telephone:     206-516-3880
Facsimile:     206-516-3883

*Attorneys for Plaintiff Mayor and City Council*
*of Baltimore, itself and on behalf of all others*
*similarly situated*

32